# CASE NO[s]. 23-5387 and 23-5388

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

———————

JAMES MYRON MITCHELL (23-5387, 23-5388);
LATISHA SHANA MENIFEE (23-5387);
*Plaintiffs – Appellees,*

~v~

HAMILTON COUNTY, TN GOVERNMENT,
*Defendant.*

DANIEL CAMERON WILKEY, In his individual and official capacity as a
Deputy Sheriff of Hamilton County TN Government (23-5387); BOBBY
BREWER, In his individual and official capacity as a Deputy Sheriff of Hamilton
County Government (23-5388).
*Defendants – Appellants.*

**On interlocutory appeal from the United States District Court for
the Eastern District of Tennessee at Chattanooga
No. 1:19-cv-305
Consolidated with No. 1:19-cv-304**

**Hon. Travis R. McDonough**

———————

# APPELLEE JAMES MYRON MITCHELL'S BRIEF

———————

**ROBIN RUBEN FLORES**
**TENN. BPR #20751**
**GA. STATE BAR #200745**
Counsel for James Myron Mitchell
4110-A Brainerd Road
Chattanooga, TN  37411
423 / 267-1575  fax 267-2703

**ANDREW C. CLARKE**
**TENN. BPR #15409**
Counsel for James Myron Mitchell
One Commerce Square
Suite 1700
Memphis, Tennessee 38103
(901) 523-1222

# ORAL ARGUMENT REQUESTED

## CORPORATE DISCLOSURE STATEMENT

No corporate disclosure statement is required of James Myron Mitchell ("Mitchell") as he is not a corporate party. *See* Fed. R. Civ. P., Rule 26.1(a). *See also* ROA-7 (Mitchell's Corporate Disclosure Statement).

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . xi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    (I)    JURISDICTION: THE TRIAL COURT'S RULING IS NOT APPEALABLE
        SINCE IT WAS BASED ON MATERIAL FACTUAL DISPUTES. . . . . . . . . . 22

    (II)   STANDARD OF REVIEW: IF THE COURT ACCEPTS JURISDICTION,
        THE STANDARD OF REVIEW IS *DE NOVO*. . . . . . . . . . . . . . . . . . . . . 28

    (III)  CONSTITUTIONAL VIOLATIONS: WILKEY VIOLATED MITHCHELL'S
        RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE
        SEIZURE BY EXCESSIVE FORCE). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         *a.*   *Wilkey's "pain compliance" claims* . . . . . . . . . . . . . . . . . . . . 30

         *b.*   *Wilkey's qualified immunity and clearly established right*
              *claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    (IV)  CONSTITUTIONAL VIOLATIONS: WILKEY VIOLATED MITCHELL'S
        RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE
        SEARCH). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       a.     *Unreasonable roadside strip search* . . . . . . . . . . . . . . . . . . . . 35

       b.     *Wilkey's qualified immunity and clearly established right claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

(V)   CONSTITUTIONAL VIOLATION: FAILURE TO INTERVENE . . . . . . . . . . . . 40

       a.     *The trial court found sufficient facts* . . . . . . . . . . . . . . . . . . 40

(VI)  STATE TORT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       a.     *Wilkey is not entitled to summary judgment on the Assault and Battery claims.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       b.     *Wilkey is not entitled to summary judgment on the Negligence claims.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

(VII) CONSTITUTIONAL VIOLATIONS: BREWER VIOLATED MITCHELL'S RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE SEIZURE BY EXCESSIVE FORCE). . . . . . . . . . . . . . . . . . . . . . . . . . . 45

       a.     *Brewer's use of force violated clearly established law.* . . . . . 46

(VIII) CONSTITUTIONAL VIOLATION: BREWER VIOLATED MITCHELL'S RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE SEARCH). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

       a.     *Brewer's search violated clearly established law.* . . . . . . . . . 51

(IX)  CONSTITUTIONAL VIOLATION: BREWER'S FAILURE TO INTERVENE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

       a.     *Brewer's claims that his failure to intervene did not violate clearly established law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

(X)   STATE TORT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

iii

*a.*     *Brewer is not entitled to summary judgment on Assault and Battery.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*b.*     *Brewer is not entitled to summary judgment on Negligence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 59

ADDENDUM:     DESIGNATED DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Anderson v. Branen*,
     17 F.3d 552 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Anderson v. Creighton*,
     483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 34, 47

*Anderson v. Liberty Lobby, Inc.*,
     477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 51

*Ashcroft v. Al Kidd*,
     131 S. Ct. 2074 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Batson v. Hoover*,
     788 F. App'x 1017 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Behrens v. Pelletier*,
     516 U.S. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bell v. Wolfish*,
     441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 38

*Berryman v. Rieger*,
     150 F.3d 561 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 49

*Campbell v. City of Springboro, Ohio*,
     700 F3d 779 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Camreta v. Greene*,
     131 S.Ct. 2020 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chappel v. Montgomery Country Fire Protection Dist. No. 1*,
     131 F.3d 564 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Colvin v. Caruso*,
605 F.3d 282 (6th Cir. 2010) ..................................... 28

*Cummings v. City of Akron*,
418 F.3d 676 (6th Cir. 2005) ..................................... 34

*Foster v. City of Oakland*,
621 F. Supp. 2d 779 (N.D. Cal. 2008) ............................. 49

*Fox v. DeSoto*,
489 F.3d 227 (6th Cir. 2007) ..................................... 29

*Goodwin v. City of Painsville*,
781 F.3d 314 (6th Cir. 2015) ..................................... 34

*Graham v. Connor*,
490 U.S. 386 (1989)................................... 30, 31, 33, 49

*Grawey v. Drury*,
567 F.3d 302 (6th Cir. 2009) ..................................... 35

*Griffin v. Hardrick*,
604 F.3d 949 (6th Cir. 2010) ..................................... 54

*Griffith v. Coburn*,
473 F.3d 650 (6th Cir. 2007) ..................................... 32

*Hagans v. Franklin Cnty. Sheriff's Office*,
695 F.3d 505 (6th Cir. 2012) ..................................... 47

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982).............................................. 28

*Harris v. City of Circleville*,
583 F.3d 356 (6th Cir. 2009) ..................................... 35

*Hearring v. Sliwowski*,
    712 F.3d 275 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hodge v. Blount Cty.*,
    No. 3:16-CV-317, 2020 U.S. Dist. LEXIS 82495
    (E.D. Tenn. May 11, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Hope v. Pelzer*,
    536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 34, 48, 51

*Iskander v.Vill. of Forest Park*,
    690 F.2d 126 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Jacobs v. Vill. of Ottawa Hills*,
    5 F. App'x 390 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Johnson v. Jones*,
    515 U.S. 304 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22

*Kijowski v. City of Niles*,
    372 F. App'x 595 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kostrzewa v. City of Troy*,
    247 F.3d 633 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Leary v. Livingston Cnty.*,
    528 F.3d 438 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Levan v. George*,
    604 F.3d 366 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Logan v. Shealy*,
    660 F.2d 1007 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Lyons v. City of Xenia*,
    417 F.3d 565 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

vii

*Martin v. City of Broadview Heights*,
    712 F.3d 951 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 47, 48, 51

*Mary Beth G. v. City of Chicago*,
    723 F.2d. 1263 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Miller v. Sanilac Cty.*,
    606 F.3d 240 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 27

*Nat'l Satellite Sports, Inc. v. Eliadis Inc.*,
    253 F.3d 900 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ortiz v. Jordan*,
    131 S. Ct. 884 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Osborn v. City of Columbus*,
    No. 22-3570, 2023 WL 2523307 (6th Cir. Mar. 15, 2023) . . . . . . . . . . . . . 53

*Pearson v. Callahan*,
    555 U.S. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Phelps v. Coy*,
    286 F.3d 295 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*,
    640 F.3d 716 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rattray v. Woodbury Cnty.*,
    908 F. Supp.2d 976 (N.D. Iowa 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Romo v. Largen*,
　　723 F.3d 670 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Saucier v. Katz*,
　　533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sexton v. Cernuto*,
　　18 F.4th 177 (6th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51

*Shreve v. Jessamine Cnty. Fiscal Ct.*,
　　453 F.3d 681 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 53

*Smith v. City of Troy*,
　　874 F.3d 938 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 53

*Stanfield v. City of Lima*,
　　727 F. App'x 841 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Stoudemire v. Mich. Dept. of Corr.*,
　　705 F.3d 560 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Summers v. Leis*,
　　368 F.3d 881 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Sumpter v. Wayne Cty.*,
　　868 F.3d 473 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Tennessee v. Garner*,
　　471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Terry v. Ohio*,
　　392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Timberlake by Timberlake v. Benton*,
　　786 F. Supp. 676 (M.D. Tenn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38

*Turner v. Scott*,
    119 F.3d 425 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Lanier*,
    520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wysong v. City of Heath*,
    260 F. App'x 848 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## CONSTITUTION OF THE UNITED STATES

Amendment IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES AND RULES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 30, 54

Fed. R. App. P., Rule 28(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Notwithstanding Mitchell's contention that this Court does not have jurisdiction over this appeal (to be argued further), Appellant Daniel Wilkey ("Wilkey") claims in his principal brief fives issues, three of which he claims "video footage" somehow exonerates him. (ROA 20 at 13-14, Statement of Issues numbered 3-5).

As to his other two issues (1 and 2), Wilkey's arguments are a rehash of the facts that the trial determined in its Memorandum Opinion. (ROA 20 at 13). For example, in his Issue 1, Wilkey claims that he had "had reason to believe" that Mitchell had a weapon or contraband and thus "took reasonable steps to ensure Mitchells' compliance by applying 'reasonable force.'" (Id.). But the trial court determined that whether the force was reasonable, (after considering the video evidence) was a question of fact for a jury. Wilkey's Issue 2, regarding the strip search, is also a rehash of the facts the trial court reviewed, and which it decided was for a jury to consider.

Brewer, in similar fashion, raises five issues, two of which (Issues 4 and 5) he claims that "undisputed video evidence shows [Brewer] did not use excessive force." (ROA 19, at 10-11). Again, this is video evidence the trial court reviewed and determined was not as conclusive as Brewer claimed.

Wilkey and Brewer's principal briefs focus on the facts, and Mitchell believes that Wilkey and Brewer will try to convince this Court of their interpretation of the video since, as Wilkey claimed, "that the events were captured on video, oral argument may be especially helpful, as it allows the Court to ask questions of counsel regarding the details of the video footage." (ROA 20 at 10). Given the trial court made its decision after a thorough review of the video evidence, which this Court can also review, Mitchell believes oral argument can assist this Court by his rebuttal argument to point out what the trial court has already decided on the facts.

## STATEMENT OF JURISDICTION

Mitchell, as argued in this brief, respectfully contests this Court's jurisdiction to hear this appeal. However, and without waiving his jurisdictional challenge, Mitchell responds to Appellants' substantive arguments from an abundance of caution. Additionally, to comport with FED. R. APP. P., Rule 28(a)(4), Mitchell states:

This Court has jurisdiction to review on interlocutory appeal a denial of qualified immunity claims, and the Court's jurisdiction lies only to the extent that the denial turns only on issues of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). There is no appellate jurisdiction to review a denial of an immunity claim *where the denial turns on factual issues*. *See Johnson v. Jones*, 515 U.S. 304, 313-18 (1985). *See also Levan v. George*, 604 F.3d 366, 370 (7th Cir. 2010) (analysis of "separability" of legal and factual issues in following *Johnson*).

As pointed out by *Mitchell*, *infra*, the trial court rendered its decision to deny Appellants' motions for summary judgment upon a fact-intensive analysis of each motion and the record. While each Appellant appears to claim they based their appeals solely upon issues of law, their own principal briefs concede or at least rely on disputed facts to support their legal issue challenges.

1

## STATEMENT OF THE ISSUES
## PRESENTED FOR REVIEW

*IN RESPONSE TO WILKEY and BREWER'S ISSUES*

1.    Does this Court have jurisdiction over Wilkey and Brewer's interlocutory appeals?

NO. The Appellants Wilkey and Brewer take issue with the trial court's factual determinations which are not subject to interlocutory appeal.

*IN RESPONSE TO WILKEY'S ISSUES*

Mitchell clarifies Wilkey's statement of issues (ROA 20, 23-5387, at 11):

1.    Did the trial court err in denying summary judgment to Wilkey on the ground of qualified immunity as it related to Mitchell's claims of excessive force, when Wilkey had reason to believe that Mitchell was in possession of a weapon or contraband and took reasonable steps to ensure Mitchell's compliance by applying reasonable force in order to fully effectuate the search, protect the safety of officer, and safeguard the preservation of evidence?

NO. Wilkey used excessive force and video evidence the trial court reviewed contradicts his assertions otherwise.

2.    Did the trial court err in denying summary judgment to Wilkey on the grounds of qualified immunity as it related to Mitchell's claim of unreasonable search, when Wilkey, in the course of carrying out a search incident to a lawful arrest, had reason to believe that Mitchell was in possession of a weapon or contraband, and, wanting to ensure the safety of officers and the preservation of evidence, performed a strip search on the Mitchell?

NO. Wilkey's strip search of Mitchell in public was unreasonable and evidence the trial court reviewed and considered contradicts his assertions otherwise.

3.    Did the trial court err in denying summary judgment to Appellant on the grounds of qualified immunity as it related to Mitchell's claim of failure to intervene when video footage of the incident indicates that Co-Appellant Brewer never used excessive force?

NO. The video evidence and the other evidence the trial court considered did not support the claim that Brewer "never used excessive force."

4.    Did the trial court err in denying summary judgment to Wilkey as to Mitchell's claims of state common law assault and battery, where Wilkey had reason to believe that Mitchell was in possession of an unidentified foreign object and took reasonable steps to ensure Mitchell's compliance by applying reasonable force in order to effectuate a search?

NO. Since the trial court found facts to support Mitchells' claims of excessive force, Wilkey was not entitled to summary judgment on these two state torts.

5.    Did the trial court err in denying summary judgment to Wilkey as to Mitchell's claim of state common law negligence, where video footage of the incident indicates that Co-Appellant Brewer never used excessive force and thus Wilkey had no duty to intervene?

NO. Since the trial court found facts to support Mitchells' claims of excessive force and failure to intervene, Wilkey was not entitled to summary judgment on this state tort.

*IN RESPONSE TO BREWER'S ISSUES*

Mitchell clarifies Brewer's statement of issues (ROA 19, at 11-12):

1.    Did the trial court err in denying Brewer qualified immunity as to Mitchell's unreasonable search claim?

3

NO. Wilkey and Brewer's strip search of Mitchell in public was unreasonable and evidence the trial court reviewed and considered contradicts their assertions otherwise.

2.    Did the trial court err in denying Brewer qualified immunity as to Mitchell's excessive force claim?

NO. The video and other evidence the trial court reviewed did not support Brewer's claims.

3.    Did the trial court err in denying Brewer Qualified Immunity as to the claim of failure to intervene in Co-Appellant Wilkey's alleged excessive force.

NO. The video and other evidence the trial court reviewed did not support Brewer's claims.

4.    Did the trial court err in denying in denying summary judgment to Brewer as to the claim of state common law assault and battery against Brewer, where the undisputed video evidence shows Brewer did not use excessive force?

NO. Since the trial court found facts to support Mitchells' claims of excessive force, Wilkey was not entitled to summary judgment on these two state torts.

5.    Did the trial court err in denying in denying summary judgment to Brewer as to the claim of state common law negligence against Brewer, where the undisputed video evidence shows Brewer did not use excessive force?

NO. Since the trial court found facts to support Mitchells' claims of excessive force and failure to intervene, Brewer was not entitled to summary judgment on this state tort.

## STATEMENT OF THE CASE

Mitchell initially brought his claims against Wilkey, Brewer, and Hamilton County Government ("County") in the Hamilton County Circuit Court, which they removed to the United States District Court for the Eastern District of Tennessee ("trial court"). (Notice of Removal RE 1, Page ID # 1-3; Complaint RE 1-1, PageID #: 4-37).

Sometime thereafter, Wilkey filed his Motion for Summary Judgment[1] and claimed:

> Qualified immunity should attach to all actions by Deputy Daniel Wilkey due to the fact that he was engaged with both Plaintiffs in a lawful police action. The *proof* conclusively demonstrates that Deputy Wilkey had probable cause to stop the vehicle of Latisha Menifee and James Mitchell due to a window tint violation. Further, the presence of the odor of marijuana and the eventual confession that there was marijuana in the car provided further cause for Deputy Wilkey to remove both occupants of the vehicle and perform a field search of both or perform a search incident to arrest of Mitchell.

---

[1] There may be some confusion here. In its Memorandum and Opinion, the trial court initially mistakenly identified Wilkey's Motion for Summary Judgment as to Mitchell and former plaintiff Menifee's claims as "Doc. 610." (Memo. Op., RE 681, PageID #: 9977). However, the trial court later correctly identified the Wilkey's motion as Document 611. (Id. at PageID #: 9994). The same is true with Appellant Brewer's Motion for Summary Judgment as to Mitchell's claims where the trial court mistakenly identified as "Doc. 611." (Memo. Op., RE 681, PageID #: 9977). However, the trial court later correctly identified the Brewer's motion as Document 610. (Id. at PageID #: 10023).

Plaintiff Mitchell's resistance to a search by reaching into his pants and squirming necessitated a more aggressive search by Deputy Wilkey and Deputy Brewer due to the fact that it was clear that Mr. Mitchell was concealing something within his pants. The Courts recognize that a police officer has the right to conduct a full search of the person in a search incident to arrest both from an officer safety standpoint and the standpoint of preservation of evidence.

The pain compliance strikes and removal of the pants of Plaintiff Mitchell were wholly necessary due to the fact that Mitchell was concealing objects in his pants which eventually turned out to be a ripped baggy, a drug syringe, and one gram worth of crack rocks. Allowing Mr. Mitchell to get into Deputy Wilkey's vehicle with such contraband on his person could have been not only dangerous to Plaintiff Mitchell but to Deputy Wilkey.

All other claims of unreasonable search and seizure, malicious prosecution, negligence, assault and battery by either Plaintiff must fail against Deputy Wilkey due to the fact that Plaintiff Mitchell created the situation in which Deputy Wilkey's acts of which both Plaintiffs complain, were necessary. Qualified immunity should attach to all of his actions as there was no constitutional violation of either Plaintiff.

(Wilkey Motion for Summary Judgment RE 611, PageID # 6688-89) (emphasis added).

On the same day Wilkey filed his Motion for Summary Judgment, Brewer filed his Amended Motion for Summary and claimed he is entitled to summary judgment because:

1.    Brewer did not violate Mitchell's clearly established statutory or Constitutional Rights.

2.    Brewer's force used against Mitchell was reasonable under the circumstances and not excessive.

3.    Brewer had no duty to intervene since Brewer did not observe Wilkey violate any of [Mitchell's][2] constitutional rights.

4.    Brewer reasonably seized Mitchell based upon probable cause to initiate the traffic stop and to extend the stop to investigate narcotics.

5.    The intrusion was also reasonable under the circumstance of the stop based on the deputies' efforts to search and secure the parties and the vehicle. Mitchell was reasonably searched based on probable cause and the totality of the circumstances.

6.    Brewer also made various claims as to why summary judgment on the state tort claims should be granted, to include an argument that since he was making a law arrest, the force used was reasonable.

(Brewer Motion for Summary Judgment RE 610, PageID # 6566-68)

On March 29, 2023, the trial court entered a 52-page Memorandum Opinion ("Opinion") on Wilkey and Brewer's Motions for Summary Judgment (Memo. Op. RE 681, PageID #: 9977-10028) wherein the trial court granted in-part and denied in-part Wilkey and Brewer's motions. (Id. at 9977). The trial court made extensive citation to the video evidence and record in describing what it reviewed and how it arrived at its determination to deny the Appellants' motion for summary judgment to most of the claims. (Memo. Op. RE 681, *in passim*).

---

[2] This appears to be a mistaken reference to Menifee. Since Brewer mentioned Mitchell in the first part of the sentence, and since there is no comma between the second part that referenced Menifee, the implication is Mitchell was the subject of the entire sentence.

Germane to Mitchell's reply is the trial court determined that Wilkey was *not* entitled to summary judgment on qualified immunity on the following of Mitchell's § 1983 claims:

1.    Excessive Force. (Id. at 10001).

2.    Unreasonable Search. (Id. at 10014 and 10015-16).

3.    Failure to Intervene. (Id. at 10017-18).

Also germane to Mitchell's reply regarding the state tort claims, the trial court specifically found since the assault and battery claims arose from Mitchells § 1983 claims, the claims could proceed against Wilkey in his individual capacity. (Id. at 10020).

4.    State Assault and Battery claims. (Id. at 10021).

5.    State Negligence claim. (Id. at 10022).[3]

Germane to Mitchell's reply to Brewer's claims is the trial court determined Brewer was *not* entitled to summary judgment on qualified immunity on the following of Mitchell's § 1983 claims:

1.    Excessive Force. (Id. at 10023-24).

2.    Unreasonable Search. (Id. at 10025).

3.    Failure to Intervene. (Id. at 10025-26).

---

[3] Wilkey did not address the state law claims as issues in his principal brief. (ROA 17, at 11).

The trial court also denied summary judgement to Brewer on the following of the state tort claims:

> 4.    Assault and Battery. (Id. at 10027).
>
> 5.    Negligence. (Id.).

In its Opinion, the trial court repeatedly identified multiple genuine issues of material facts, which the trial court relied upon when it denied Appellants' Motions for Summary Judgment. Mitchell has incorporated the trial court's recitation of the facts from its Opinion to support Mitchell's factual basis when drafting this Statement of the Case. Internal citations will be omitted absent any citations to videos. Additionally, since the trial court relied on the use of footnotes at times to describe the events in the videos of the events, Mitchell will incorporate those findings verbatim as believed necessary.

### Trial Courts' findings fact – Document 681.

On July 10, 2019, Menifee was driving Mitchell either to his residence or to the emergency room. Mitchell was suffering intense pain from a hernia. As Menifee rounded a curve, Wilkey—who, alongside Brewer, had been monitoring traffic from his patrol car—noticed what he asserts were prohibitively dark window tints on the vehicle. Wilkey and Brewer began following the vehicle in their respective patrol cars, and, a few seconds later, Wilkey flashed his blue lights, signaling for Menifee to pull over. (*Wilkey and Brewer Dashcam Video*, at 21:27:39.) According to Wilkey, his patrol-car windows were down, and he thought he smelled marijuana emanating from Mitchell's vehicle as he trailed behind it.

(Memo. Op. RE 681, PageID #: 9978).

> After the three cars—Mitchell's, Wilkey's, and Brewer's, in that order—pulled over onto the shoulder of the highway, Wilkey and Brewer approached Mitchell's vehicle, with Wilkey moving towards the driver's side window and Brewer towards the passenger's side window. (*Id.* at 21:28:15–21:28:23.) After a brief exchange, Mitchell opened the passenger-side door and emerged with his arms raised high over his head. (*Id.* at 21:29:00.).

(Memo. Op. RE 681, PageID #: 9979).

> Mitchell immediately and without prompting turned to face the vehicle. (*Id.* at 21:29:02.) With a light touch on the back from Brewer and instruction to "put your hands up on the top of the car" and "spread your feet," Mitchell leaned over the roof of the vehicle with both arms extended and palms pressed flat against it, then shuffled his feet apart. (*Id.* at 21:29:05.) Mitchell's arms and palms remained pressed against the vehicle as Brewer patted against the outside of Mitchell's clothing. (*Id.* at 21:29:10–21:29:25.)

(Memo. Op. RE 681, PageID #: 9979).

> As Brewer patted down Mitchell's pockets, Brewer asked, "what you got in this pocket down here?" (*Id.* at 21:29:25.) Mitchell responded, "my money." (*Id.* at 21:29:27.) Around the same time, Wilkey opened the driver's side door and pulled Menifee out of the vehicle. (*Id.* at 21:29:25.) As soon as Menifee was out, Wilkey patted against the outside of her clothing, secured her with handcuffs, and walked her to the back of the vehicle, in front of Wilkey's patrol car. (*Id.* at 21:29:30–21:29:48.) Brewer, still patting down Mitchell, observed that it "feels like there is a little baggie of something in there." (*Id.* at 21:29:30.) Mitchell voluntarily identified the item as marijuana. (*Id.*) Brewer then asked Mitchell if he "mind[s] if [he] go[e]s in there and get[s] it," then proceeded to do so. (*Id.* at 21:29:34.)

10

(Memo. Op. RE 681, PageID #: 9979-80).

> Brewer fished the object out of Mitchell's pocket, confirmed it as marijuana, and placed it on the roof of the vehicle near Mitchell's extended arms. (*Id.* at 21:29:40–21:29:47.) Wilkey left Menifee standing, still handcuffed, between her vehicle and the patrol car, and began walking towards Mitchell and Brewer. (*Id.* at 21:29:50.) While Wilkey was walking away from Menifee, she assured him, "I ain't going nowhere." (*Id.* at 21:29:51.) As Brewer dropped the marijuana on the top of the car by Mitchell, Mitchell slowly raised his flattened left-hand palm a few inches from the roof of the vehicle, and his hand hovered in that space briefly, moved downward and momentarily touched the roof's surface, then retreated back to an open-palmed, hovering position. (*Id.* at 21:29:53–21:29:54.) While Mitchell's hand was in this position, Wilkey—who was at this point immediately to Mitchell's left—said "hey, hey, hey," and grabbed Mitchell's left arm, pulling it behind Mitchell's back. (*Id.* at 21:29:54–21:30:00.) Brewer—standing to Mitchell's right—then brought Mitchell's right arm behind Mitchell's back for Wilkey to secure with handcuffs. (*Id.* at 21:29:59–21:30:01.)

(Memo. Op. RE 681, PageID #: 9980).

> While holding both of Mitchell's arms behind his back, Wilkey said, "listen, if that's all you've got, then I'll write you a ticket." (*Id.* at 21:30:01.) Either Wilkey or Brewer followed up with, "if you want to keep reaching for stuff," and "hold still." (*Id.* at 21:30:09.) Mitchell denied that he was reaching. (*Id.* at 21:30:10.) Either Wilkey or Brewer responded, "well, you kind of did." (*Id.* at 21:30:11.) Wilkey and Brewer then walked Mitchell over to where Menifee was standing. (*Id.* at 21:30:12–21:30:15.) Wilkey, with one hand still on Mitchell's cuffed wrists, pointed towards Wilkey's patrol car, indicating for Menifee to turn around and walk towards it. (*Id.* at 21:30:15.) Menifee complied and stood with her back against the front of the patrol car. (*Id.* at 21:30:21.)

(Memo. Op. RE 681, PageID #: 9981).

11

Wilkey and Brewer both turned their attention to Mitchell, with Wilkey positioning Mitchell to stand facing the highway as he started to open up Mitchell's pockets. (*Id.* at 21:20:24.) As Wilkey patted down and pulled out Mitchell's pant-pockets, Wilkey asked, "you ain't got anything else on you, do you?" (*Id.* at 21:30:25.) Mitchell answered, emphatically, "no!" (*Id.* at 21:30:26.) Wilkey pressed his hand against Mitchell's groin area, and Mitchell grunted, telling the officers he had a hernia. (*Id.* at 21:30:34.) Wilkey assured Mitchell, "I ain't gonna hurt your hernia," then started bunching up and pulling at the fabric by Mitchell's groin. (*Id.* at 21:30:34–21:30:51.) Brewer, at this point out of the camera's view, examined Mitchell's socks. (*Id.* at 21:30:56.) As Wilkey tugged at Mitchell's waistband, Wilkey asked, "how'd you get a hernia?" (*Id.* at 21:31:12.) Mitchell answered, and Wilkey rotated to position himself directly behind Mitchell. (*Id.* at 21:31:23.) From this position, Wilkey continued to tug on Mitchell's waistband, then clutched Mitchell's groin from in between Mitchell's legs. (*Id.* at 21:31:29.) Mitchell grunted and bowed his head forward. (*Id.* at 21:31:30.) Wilkey advised Mitchell to "hold still, dude." (*Id.* at 21:31:31.) Meanwhile, Brewer questioned Menifee, still handcuffed and standing with her back against the patrol car, about who owned the vehicle. (*Id.* at 21:31:30.)

(Memo. Op. RE 681, PageID #: 9981-82).

Wilkey continued to prod at Mitchell's groin, asking "what's that right there?" (*Id.* at 21:31:40.) Mitchell groaned, "that's a hernia." (*Id.* at 21:31:41.) Brewer, shining his flashlight at Mitchell's backside, warned Mitchell to "stop reaching in there." (*Id.* at 21:31:42–21:31:45.) Mitchell told them, "I ain't got nothing." (*Id.* at 21:31:46.) Mitchell and Wilkey engaged in a brief exchange about Mitchell's hernia and the marijuana that was found on him. (*Id.* at 21:31:46–21:31:58.) Brewer repeatedly asked Mitchell to "stop tensing up." (*Id.* at 21:31:56–21:32:01.) While Brewer was administering these warnings, Wilkey, in one swift motion, pushed the back of Mitchell's head down towards the hood of the patrol car. (*Id.* at 21:31:59.) As this happened, Menifee begged, "be still." (*Id.*)

(Memo. Op. RE 681, PageID #: 9982).

Menifee seems to say [be still] many times during the encounter, but it is unclear to whom the message is directed each time, especially considering Mitchells' recollection that "all [he] could hear [Menifee] telling [was] don't kill [Mitchell]." (Doc. 611-2, at 7.) Mitchell and Menifee also dispute Wilkey and Brewer's contention that Menifee's pleas suggest Mitchell was resisting arrest by stating Menifee was instead advising Mitchell "to stop *moving* from fear they would kill him." (Doc. 645, at 32 (emphasis in original)).

(Memo. Op. RE 681, PageID #: 9982, fn 12) (alteration in original).

Brewer flashed his light behind Mitchell, and both Brewer and Wilkey directed their gazes towards Mitchell's backside. (*Id.* at 21:32:06.) Menifee, by then in a crouched position, remained facing Wilkey, Brewer, and Mitchell. (*Id.*) As Brewer lifted Mitchell's cuffed right arm from behind, Mitchell spread his fingers apart and slowly began drawing his hands downward. (*Id.* at 21:32:12.) Menifee again shouted, "just be still!" (*Id.* at 21:32:13.) Brewer asked Mitchell to "stop reaching for it, tell us what it is." (*Id.* at 21:32:15.) Mitchell seemed to say something, most of which is incomprehensible to the Court. (*Id.* at 21:32:16.) What is clear, however, are the words "I'll give it to you right now man," then, louder, "I'll give it to you!" (*Id.* at 21:32:19.)

(Memo. Op. RE 681, PageID #: 9982-83).

Menifee says some version of ["just be still!"] many times throughout this part of the video—more times than the Court recounts here.

(Memo. Op. RE 681, PageID #: 9982, fn 13) (alteration in original).

Wilkey then repositioned Mitchell and kneed him in his mid-section. (*Id.* at 21:32:19.) Brewer continued to hold Mitchell's forearm as Wilkey yanked Mitchell down to the ground. (*Id.* at 21:32:19–21:32:22.) With Wilkey, Brewer, and Mitchell now all on the graveled ground beside Wilkey's patrol car, Wilkey repeatedly and forcefully punched Mitchell with a closed fist.

(*Id.* at 21:32:23–21:32:33.) Between punches, Wilkey warned, "quit reaching in your fucking pants, man," to which Mitchell insisted, "I'm about to give it to you!" (*Id.* at 21:32:25–21:32:27.) Wilkey punched Mitchell one more time and said, "yeah, that's what you get, I told you." (*Id.* at 21:32:32–21:32:37.) Wilkey then yelled, "you fucking bite me . . ." while jerking back the same arm he had just used to punch Mitchell. (*Id.* at 21:32:38.) Mitchell cried out, "I ain't never bite you—I would never do that!" (*Id.* at 21:32:41.) Then, "I'm not resisting!" (*Id.* at 21:32:46.) Brewer applied pressure with at least one arm to restrain Mitchell while Wilkey punched him. (*Id.* at 21:32:22–21:33:13.) Apart from wincing at Wilkey's blows, Mitchell's body appears to have remained still during this sequence of events. (*Id.*)

(Memo. Op. RE 681, PageID #: 9983-84).

Once Mitchell, Wilkey, and Brewer went to the ground, all were outside the vision of Wilkey's dashcam video. (*Wilkey and Brewer Dashcam Video*, at 21:32:23.) However, the actions that took place on the ground were captured in part by Brewer's dashcam video. For convenience, the Court refers only to the side-by-side video, which includes the videos captured by both Brewer and Wilkey's dashcams.

Because Brewer's dashcam was a few yards away from where Mitchell, Brewer, and Wilkey were positioned on the ground, it not entirely clear from the video which officer was punching Mitchell and where on his body Mitchell was being punched. Menifee stated in deposition that "it looked as if [Brewer] was punching [Mitchell]" when on the ground and disagreed with the statement "there's no evidence that Mr. Brewer punched Mr. Mitchell." (Doc. 610-2, at 38.) She also said she remembered "see[ing] Officer Brewer hit [Mitchell] with his fist and his feet." (*Id.* at 36.) Mitchell stated in deposition that Brewer "snuck some [punches] in" while on the ground and hit him in the back with his knee. (*Id.* at 47.)

(Memo. Op. RE 681, PageID #: 9983, fn 14).

14

The Court infers the punches Wilkey issued were relatively forceful based on the sound captured by the video and the apparent speed with which Wilkey punched. From the Court's review, Wilkey punched Mitchell at least seven times while Mitchell was on the ground. Mitchell recalled in deposition that "[Wilkey] started beating on [him] like a drum." (Doc. 611-2, at 9.)

(Memo. Op. RE 681, PageID #: 9983, fn 15).

Though it is difficult to make out the exact words used, Wilkey appears to say, essentially, "you bite me, I'll punch you." (*Wilkey and Brewer Dashcam Video*, at 21:32:39.)

Mitchell and Menifee's description of the recording cites "Wilkey plac[ing] foot on Mitchell" at time stamp 21:32:42. (Doc. 645, at 9.) Because Wilkey, Brewer, and Mitchell, all visible from Brewer's dashcam video, were at least a few yards from Brewer's car, it is difficult for the Court to state with certainty where Wilkey placed his lifted foot or knee. However, Mitchell clearly yelled at 21:33:06, "you got your knee on my ear!" And Wilkey responded, "yeah, no shit, quit moving!" (*Wilkey and Brewer Dashcam Video*, at 21:33:07.) Mitchell retorted, "I ain't moving!" (*Id.* at 21:33:08.)

Wilkey at one point told Mitchell to "stop pushing against me," but it is not clear Mitchell is moving at this point. (*Wilkey and Brewer Dashcam Video*, at 21:33:07.) In deposition, Mitchell recalled "trying to stop the blows" by "tighten[ing] up," because "[y]ou can't do nothing but tighten up, try to pad yourself." (Doc. 611-2, at 12.) According to Mitchell, "[i]f [he] was resisting, they would've shot [him] in [his] head if [he] was resisting." (*Id.*)

(Memo. Op. RE 681, PageID #: 9984, fn[s] 17, 18, and 19).

Wilkey and Mitchell shouted at each other, still on the ground, and Wilkey said, "I ain't beat you up, I took you to the ground because you were reaching for something on us." (*Id.* at 21:33:19.) Mitchell told the officers, "I ain't got nothing on me."

15

(*Id.* at 21:33:20.)  Wilkey responded, "yeah, well we're gonna check."  (*Id.* at 21:33:21.)  Wilkey then rolled Mitchell over onto his side.  (*Id.* at 21:33:27.)  Mitchell groaned.  (*Id.*)  Wilkey or Brewer again advised Mitchell to "quit tensing up" and asked if he had something in his pants.  (*Id.* at 21:33:43.)  Mitchell denied having anything.  (*Id.* at 21:33:44.)  Wilkey or Brewer told Mitchell to "hold still," and Wilkey slapped Mitchell somewhere on the lower half of his body, warning, "I'm gonna keep hittin' if you don't stop reaching."  (*Id.* at 21:33:47–21:33:49.)

(Memo. Op. RE 681, PageID #: 9984-85).

Wilkey instructed Mitchell to "roll this way," and, no more than a second later, pulled on Mitchell and rolled him onto his back, with Mitchell's feet up in the air facing the patrol car.  (*Id.* at 21:33:57.)  Mitchell cried out, "my arm! My arm! My arm! My arm! My arm, man!"  (*Id.* at 21:34:07.)  A car drove by along the highway beside the parked patrol cars as Mitchell asked, "you gonna strip me butt naked on the freeway?"  (*Id.* at 21:34:11.)  "You fucking . . . you fucking kick me," Wilkey warned, "it is not gonna be good for you."  (*Id.* at 21:34:16.)  "I ain't gonna kick you," Mitchell promised.  (*Id.* at 21:34:18.)  Wilkey and Brewer yanked on  Mitchell's pant legs, then rotated his body so that it was parallel to the patrol car.  (*Id.* at 21:34:19.)  Mitchell wriggled on the ground as Wilkey and Brewer gripped his legs.  (*Id.* at 21:34:22.)

(Memo. Op. RE 681, PageID #: 9985).

Wilkey or Brewer asked, "what the fuck is it?"  (*Id.* at 21:34:26.)  "That's my dick."  (*Id.* at 21:34:27.)  "That ain't your fucking dick, man."  (*Id.* at 21:34:29.)  Wilkey or Brewer and Mitchell discussed what item Mitchell might have on him, with Mitchell proclaiming that it is a "piece of plastic."  (*Id.* at 21:34:48.)  At Wilkey's directive to "take [Mitchell's] clothes off," Brewer began to strip down Mitchell.  (*Id.* at 21:35:12.)  Wilkey proclaimed, "that's what [Mitchell] gets for reachin'."  (*Id.* at 21:35:12.)  *Brewer pulled Mitchell's pants down and off of his body.  (Id. at 21:35:30.)  Mitchell, still pinned to the ground by Wilkey, yelled, "help!"  (Id. at 21:35:37.)  As Brewer shook out*

16

> *Mitchell's pants, Mitchell told Wilkey, "you're hurting me, man," and, more urgently, "my shoulders!"* (*Id.* at 21:35:45.) Wilkey responded, "I ain't hurtin' you man, I'm holding you down." (*Id.* at 21:35:47.)

(Memo. Op. RE 681, PageID #: 9985) (emphasis added).

> From the ground, Mitchell asked, "can you help me up, man?" (*Id.* at 21:36:08.) Brewer and Wilkey each took one arm and pulled Mitchell, still in his underwear, up off the ground. (*Id.* at 21:36:10.) Mitchell, doubled over himself, moaned. (*Id.* at 21:36:14.) Wilkey told Mitchell he was "an idiot" as Brewer tugged down Mitchell's underwear, illuminating Mitchell's exposed buttocks with a flashlight. (*Id.* at 21:36:20.) Another car drove by along the highway. (*Id.*)

(Memo. Op. RE 681, PageID #: 9986).

> Wilkey kept his hands on Mitchell, positioning him so that Mitchell's back faced the highway, as Brewer continued to examine Mitchell's exposed buttocks. (*Id.* at 21:36:20–21:36:30.) Menifee remained leaning against the back of her vehicle, with Wilkey and Brewer's examination of Mitchell in her direct line of sight. (*Id.*) Mitchell quietly pled: "Please don't kill me." (*Id.* at 21:36:31.) Wilkey or Brewer commanded Mitchell to "stand up straight," and, as Mitchell began to complain about pain in his leg, Wilkey wrapped his left forearm around Mitchell's chest, Brewer took hold of Mitchell's cuffed wrists, and the two lurched Mitchell over to the hood of Wilkey's patrol car. (*Id.* at 21:36:42.) As Wilkey and Brewer bent Mitchell, buttocks still exposed, over the hood of the vehicle, Wilkey told Mitchell to "stand up straight," *placing both of his hands around Mitchell's head and pulling upward*. (*Id.* at 21:36:41.) Mitchell yelled, "I got a hernia!" (*Id.* at 21:36:43.)

(Memo. Op. RE 681, PageID #: 9986) (emphasis added).

> With Brewer continuing to restrain Mitchell from behind, Wilkey lifted Mitchell's shirt up and started to grab at Mitchell's underwear. (*Id.* at 21:36:49.) Wilkey told Mitchell to "quit

reaching in your fucking pants." (*Id.* at 21:36:59.) Mitchell denied reaching. (*Id.* at 21:37:00.) Brewer and Wilkey both locked their arms around Mitchell's body and pushed him up onto the hood of the car, pressing his ear and left side of his head into it. (*Id.* at 21:37:04.)

(Memo. Op. RE 681, PageID #: 9986).

Wilkey unlocked his arm from around Mitchell's body and walked to the trunk of his patrol car. (*Id.* at 21:27:32.) Brewer continued to press Mitchell's head against the hood of the car, telling him to "hold still." (*Id.* at 21:37:42.) Mitchell explained that he was trying to put his pants on and give Brewer the item he had on his person. (*Id.* at 21:38:02.)

(Memo. Op. RE 681, PageID #: 9986-87).

Wilkey returned to the hood of the car behind Mitchell, who was still facing the highway and Menifee, and pulled a rubber glove onto his right hand. (*Id.* at 21:38:03.) Wilkey reached into Mitchell's underwear through the right leg hole, then pulled down Mitchell's underwear, fully exposing Mitchell's buttocks. (*Id.* at 21:38:07.) Menifee can be heard saying, "what the fuck?" (*Id.* at 21:38:08.) Wilkey and Mitchell rotated slightly such that Mitchell's backside was directly facing Menifee. (*Id.* at 21:38:15.) *With his gloved hand, Wilkey reached into Mitchell's anal area.* (*Id.* at 21:38:12.) When Mitchell craned his neck to look at Wilkey, he smacked Mitchell's buttocks and told him to "hold still." (*Id.*) Wilkey pulled out a small bag and dropped it on the hood of the car in front of Mitchell. (*Id.* at 21:38:19.) Brewer, still gripping on to Mitchell, pressed Mitchell's right shoulder down into the hood of the car. (*Id.* at 21:38:25.) *Wilkey continued to probe Mitchell's anal area, standing directly behind Mitchell and in front of Menifee.* (*Id.* at 21:38:26.) Wilkey grabbed the back of Mitchell's neck with one hand to push it down towards the car and used the other to continue searching. (*Id.* at 21:38:28.) At one point, Wilkey struck Mitchell's leg with his knee, commanding Mitchell to "move your leg." (*Id.* at 21:38:35.)

18

(Memo. Op. RE 681, PageID #: 9987-88) (emphasis added).

> Mitchell grunted as Wilkey continued to prod at Mitchell's anal area and crotch—now with both hands—and Brewer pushed Mitchell down against the front of the car. (*Id.* at 21:38:46.) A truck passed by on the highway, driving not more than a few yards from where Mitchell was bent over the front of the patrol car with his exposed buttocks facing the road. (*Id.* at 21:38:57.) Wilkey moved out from behind Mitchell and examined the small bag he had placed on the hood of the car earlier. (*Id.* at 21:39:04.)

(Memo. Op. RE 681, PageID #: 9988).

> Wilkey locked his arm around Mitchell again, and Brewer and Wilkey dragged Mitchell over to the car door. (*Id.* at 21:39:15.) Mitchell was still pantsless. (*Id.*) Another car passed. (*Id.*) Wilkey and Brewer pushed Mitchell into the back seat of the patrol car, and Wilkey told Mitchell to "move your feet, or I'ma break your feet." (*Id.* at 21:39:32.) Mitchell pulled his feet into the car, and Wilkey shut the door. (*Id.* at 21:39:39.) As soon as Wilkey turned around, he said, "there's a needle," and picked up an object from the ground by the right back tire of Wilkey's patrol car. (*Id.* at 21:39:41.)

(Memo. Op. RE 681, PageID #: 9988).

> With Mitchell cuffed in the back of the car, Wilkey and Brewer looked through Mitchell's vehicle as Menifee remained on the ground with her back against the trunk. (*Id.* at 21:39:56.) Mitchell repeatedly yelled "hey!" from the back of Wilkey's patrol car, eventually warning he was "about to throw up." (*Id.* at 21:41:18, 21:41:41.) He then asked Brewer or Wilkey to "take me to jail," and for Brewer or Wilkey to "put [his] clothes on." (*Id.* at 21:42:31.) Mitchell told them he needed some air, and Wilkey responded that he should have thought about that before "starting to . . . resisting." (*Id.* at 21:43:06.) Mitchell told Wilkey he "wasn't trying to resist you, man"; he was trying to "give [the officers] the shit" because he "didn't wanna get embarrassed." (*Id.* at 21:43:13–21:43:22.)

19

(Memo. Op. RE 681, PageID #: 9988-89).

> While Brewer and Wilkey continued to search Mitchell's car,
> Mitchell yelled about his legs, exclaiming "there's blood all over
> the place!" (*Id.* at 21:44:40.) Wilkey or Brewer responded,
> "yeah, because you started resisting." (*Id.* at 21:44:44.) Mitchell
> screamed for help, telling the officers he was about to pass out.
> (*Id.* at 21:45:10.) Wilkey led Menifee—still bound by
> handcuffs—off to the right of Brewer's patrol car. (*Id.* at
> 21:46:05.) Mitchell sobbed, continuing to yell for help. (*Id.* at
> 21:46:24.) After a few minutes, Mitchell said he "can't feel [his]
> fingers" and moaned about pain in his head and wrists. (*Id.* at
> 21:47:08–21:47:38.)

(Memo. Op. RE 681, PageID #: 9989).

> An officer heard over the radio advised Wilkey to check on his
> "prisoner's handcuffs" (*Id.* at 21:48:33.) He walked to the
> backseat of his patrol car and opened the door. (*Id.* at 21:48:50.)
> Wilkey told Mitchell to get out of the car and stand up. (*Id.* at
> 21:49:00.) Mitchell obliged. (*Id.*) Wilkey adjusted Mitchell's
> handcuffs and returned him to the car. (*Id.* at 21:49:40.) Brewer
> continued to search Mitchell's car. (*Id.* at 21:51:20.)

(Memo. Op. RE 681, PageID #: 9989).

> Over ten minutes later, Menifee—still handcuffed—walked out
> in front of Wilkey's patrol car with Wilkey behind her. (*Id.* at
> 22:02:20.) As Wilkey unfastened the handcuffs, he told Menifee
> he would "write [her] a ticket." (*Id.* at 22:02:21.) Menifee
> reentered the driver's side of her car. (*Id.* at 22:03:35.) Wilkey
> drove Mitchell to jail. (*Id.* at 22:18:37.)

(Memo. Op. RE 681, PageID #: 9989).

> After Mitchell was released from jail, he went to the hospital
> three different times and was diagnosed with a thigh contusion,
> a scalp contusion, a possible anal fissure, and possible back and
> neck strain.

(Memo. Op. RE 681, PageID #: 9989-90).

## SUMMARY OF THE ARGUMENT

The trial court found triable questions of fact with respect to whether Wilkey and Brewer were liable to Mitchell violating his constitutional rights. Appellants' arguments in this interlocutory appeal merely disagree with the trial court's findings of fact, and such issues are not properly addressed in an interlocutory appeal. The Appellants do this despite their knowledge that the trial court found triable questions of fact with respect to clearly established law regarding Mitchell's constitutional claims. As to the state claims, the trial court rendered its decision to deny summary judgment on its factual findings. Still, Appellants raise this appeal based upon the trial court's findings and thus is not proper for an interlocutory appeal.

## ARGUMENT

**(I)** <u>JURISDICTION</u>: THE TRIAL COURT'S RULING IS NOT APPEALABLE SINCE IT WAS BASED ON MATERIAL FACTUAL DISPUTES.

Mitchell avers that this Court has no jurisdiction to hear the instant appeal. The U.S. Supreme Court has held that an "instant appeal is not available … when the district court determines that factual issues genuinely in dispute preclude summary adjudication." *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). *See also Romo v. Largen*, 723 F.3d 670, 674 (6th Cir. 2013) ("a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial") (quoting *Johnson v. Jones*, 515 U.S. at 319-20).

The trial court reviewed the events, which included in-depth recitation of what it observed, in reaching its conclusion that the Appellants were not entitled to summary judgment on qualified immunity. For example, while addressing Mitchell's excessive force claims, the trial court found that the video of the events did not "plainly" corroborate Wilkey's narrative that Mitchell was resisting the deputies and the issue "appears open to

interpretation." (Memo. Op. RE 681, PageID #: 9996. Fn. 28)[4]. The trial court also noted:

> For instance, the former Hamilton County District Attorney, upon reviewing footage from the encounter, stated in an affidavit that he considered Mitchell to be someone "who appears to fully comply with [Mitchell[5] and Brewer's] demands and does not show any resistance.

(Id.).

As another example regarding the excessive force claims, the trial court also found despite Wilkey's claims to the contrary, the video did not appear to show that Mitchell attempted to "grab the contraband" from the top of the car (Memo. Op. RE 681, PageID #: 9998, ("It does not appear that Mitchell "grabbed" anything... .)) and thus a " reasonable juror could conclude that Wilkey's response to this action – tackling Mitchell to the ground and  punching him at least a half dozen times – was excessive." (Id.).

As yet another example regarding the excessive force claims, the trial court noted that Brewer acknowledged in his motion "that 'the force used by [him] on the night of July 10, 2019 is disputed[,]' as Menifee and Mitchell both claim … but nonetheless argues 'the video clearly shows that [he] never

---

[4] In its analysis of Brewer's claims, the trial court incorporated its findings in the previous portions of the Opinion. (Memo. Op. RE 681, PageID ##: 10023-27, *in passim*).

[5] This is a direct quote from the trial court's opinion. It is possible that this bracketed clause should be "Wilkey and Brewer's"

once struck Mitchell in any way[.]" (Mem. Op. RE 681, PageID #: 10023-24).

But as the trial court said:

> The Court disagrees. As noted in the Court's description of the video, there are multiple instances—particularly while Brewer, Wilkey, and Menifee[6] are all on the ground—when it is unclear which officer is punching Mitchell and where on his body Mitchell is being punched. *See supra* Section I. Mitchell and Menifee both testify that Brewer punched Mitchell while on the ground.

(Id. at 10023).

Another example of the trial court's factual findings regards the strip search and the unreasonable search claim. The trial court compared the facts of this case to facts in *Timberlake by Timberlake v. Benton*, 786 F. Supp. 676 (M.D. Tenn. 1992) where the plaintiffs in that case were subjected to a strip search in the back of a patrol car parked on the side of the road. (Memo. Op. RE 681, PageID #: 10012).

> Unlike in *Timberlake by Timberlake*, in which the court found the officers took *some* steps—albeit insufficient ones—to provide plaintiffs privacy during the strip search, nothing in the record suggests any such efforts were made for Mitchell. *Id.* at 692–93. Mitchell's strip search was conducted not in the back of a patrol car, but outside, directly in front of one. There is no question that passerbys could—and likely did—witness the highly invasive search; *Menifee stood watching right next to Mitchell as it happened.*

(Id.) (Emphasis added).

---

[6] Direct quote but it seems this clause should have read "Brewer, Wilkey, and Mitchell."

Throughout his principal brief, Wilkey himself based his arguments upon factual issues reviewed and analyzed by the trial court and in so doing appears that he is attempting to persuade this Court to believe his version of the facts, and the same holds true for Brewer. For example, Wilkey attempts to minimize his conduct. (ROA-20, at 40 ["his underwear was only partially removed;" "Wilkey did not 'forcibly expose private areas [Mitchell's body] for a *prolonged* period;" "Nor did he expose Mitchell's 'buttocks to public viewing … in broad daylight' at the 'tail-end of rush hour") (emphasis added).

Brewer also attempted to minimize his conduct despite the trial court's findings. (ROA-19, at 35-36 ["Brewer did not bare Mitchells' buttocks to public viewing … in broad daylight…at the tail-end of rush hour;"] ["Brewer did not require Mitchell to lift his genitals or cough in a squatting position."]). Brewer also made multiple "what if" type rationales in his brief about the strip search by suggesting that "[t]o the extent that any citizen observed the search there is no evidence that such a person would have seen the private areas of Mitchell's body." ROA-19, at 37. Yet, Brewer forgets that Menifee was watching the entire event.

Still, the trial court unequivocally found that the location of the event was a "highly public site" and described the search as "extraordinarily invasive" in nature and noted that Wilkey and Brewer "disrobed Mitchell as

25

he stood on the side of the highway, handcuffed, and illuminated by the patrol car's headlights." (Memo. Op. RE 681, PageID #: 10012-13). Wilkey, much like part of Brewer's argument, suggests that if the strip search was done at night, then there is no liability.

In another example of his attempts to place a spin on the facts, Wilkey claims that he, "in the course of the strip search, applied a *light smack* of Mitchell's buttocks in order to get Mitchell to be still." (ROA-20, at 30) (emphasis added). However, the trial court characterized the blow as "smacked." (Memo. Op. RE 681, PageID #: 9987).

Appellants' rationales are merely a quest to convince this Court of their versions of the facts. The Sixth Circuit has held that whenever "the defendants' appeal attempts to persuade us to believe their version of the facts, we must dismiss the appeal." *Berryman v. Rieger*, 150 F.3d 561, 565 (6th Cir. 1998). "[I]f what is at issue in the appeal is nothing more than 'whether the evidence could support a finding that particular conduct occurred,' there is no appellate jurisdiction." Id. at 563 (quoting, *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). This Honorable Court "ha[s] learned by experience that defendants sometimes attempt simply to protract the litigation and manipulate the fact-law distinction drawn by *Mitchell*, *Johnson*, and *Behrens* to create the appearance of jurisdiction." *Berryman* at 564

(referencing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)). But "[o]nce a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, [appellate] jurisdiction ends and the case should proceed to trial." *Berryman* at 564-65.

Just like the defendants in *Berryman*, Appellants constructed their interlocutory appeal on little more than "contesting what really happened" and attacked the trial court's reasoning and factual determinations. Appellate "jurisdiction does not extend to appeals that merely quibble with the district court's reading of the factual record." *Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008).

As noted in the Statement of the Case, the trial court went into detail how Appellants' accounts were contradicted by the video footage. Appellants bemoan *throughout* their principal briefs *their view of the facts* while ignoring the trial court must take the facts in the light most favorable to the non-moving party[7]. Given that Appellants' briefs merely attack the factual finding of the trial court, Mitchell respectfully submits this Court does not have the jurisdiction to hear this appeal.

---

[7] A Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

**(II)    STANDARD OF REVIEW: IF THE COURT ACCEPTS JURISDICTION, THE STANDARD OF REVIEW IS *DE NOVO*.**

If this Court accepts jurisdiction, "this Court conducts *de novo* review of the district court's denial of a defendant's motion for summary judgment on the basis of qualified immunity…." *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004) (citing *Chappel v. Montgomery Country Fire Protection Dist. No. 1*, 131 F.3d 564, 573 (6th Cir. 1997)).

The Court of Appeals reviews summary judgment motions "using the same Rule 56(c) standard as the district court." *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment is never appropriate unless "the evidence … is so one-sided that one party must prevail as a matter of law." *Colvin v. Caruso*, 605 F.3d 282, 288-89 (6th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court "must draw all reasonable inferences in favor of the nonmoving party," which is White. *Colvin* at 288, (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A qualified immunity defense boils down to the question of whether the Officers "violated a 'clearly established' right." *Camreta v. Greene*, 131 S.Ct. 2020, 2031 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The first prong of qualified immunity is whether "the official violated a statutory or constitutional right" (in this case, the right to be

free from unreasonable search and seizure); and the second prong is whether "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011). The Court need not address these two elements in any particular order. *See Id.*, (quoting *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009)).

When determining whether a constitutional right was violated, "[t]he question we must ask is whether, under the **totality of the circumstances**, the officer's actions were objectively reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236-37 (6th Cir. 2007), (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)) (emphasis added).

If the officer's actions were not reasonable under the circumstances, then the question becomes whether the officer should have known that, at the time, the law is "clearly established" for purposes of denying immunity if the "contours of the right" at issue were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). One way to show 'fair warning' is by pointing to a prior case with similar facts, but that is not the only way to do so. *See, e.g., United States v. Lanier*, 520 U.S. 259, 271 (1997); *Hope v. Pelzer*, 122 S. Ct. 2508 (2002). In other words, if a reasonable officer would have known not to act (as the Appellants did in this case) then

such an officer is not entitled to immunity. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013) (citing *Anderson* at 640)).

**(III)    CONSTITUTIONAL VIOLATIONS: WILKEY VIOLATED MITCHELL'S RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE SEIZURE BY EXCESSIVE FORCE).**

In his effort to avoid liability under § 1983 for violation of Mitchell's right to be free from an unreasonable seizure by excessive force, Wilkey goes to great lengths to justify his video recorded conduct and then makes the daring assertion that "[e]ven if an officer's actions amount to unconstitutional excessive force, qualified immunity still applies if the right was not 'clearly established.'" (ROA-20 at 33).

*a.    Wilkey's "pain compliance" claims.*

The Fourth Amendment to the United States Constitution grants persons the "right to be free of excessive force when police make an arrest or seizure." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). The U.S. Supreme Court has established a "objective reasonableness" test for reviewing excessive force claims. *See Graham*, at 396-97; *see also Stanfield v. City of Lima*, 727 F. App'x 841, 845 (6th Cir. 2018) (excessive force claims analyzed under the Fourth Amendment and its reasonableness standard.).

When conducting its review, a court must evaluate the officer's actions from "the perspective of a reasonable officer on the scene" at the time of the alleged conduct; after-the-fact speculation as to what the official *should* have done is prohibited. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). *Graham* requires the court to examine "the facts and circumstances of each particular case," balancing factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). An officer's "subjective beliefs about the search are irrelevant." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

In the instant case, the trial court found that the video of the events "from the perspective of a reasonable officer demonstrates that genuine issues of material fact remain as to whether Wilkey's use of 'Pain Compliance' strikes on Mitchell was excessive." (Memo. Op. RE 681, PageID #: 9995). For example, the trial court noted that it was unclear that Mitchell posed a threat to the officers' safety or failed to comply with the officers' commands before "Wilkey struck Mitchell's thigh with his knee, yanked Mitchell to the ground on the side of the road, and delivered approximately seven close-fisted

31

punches to Mitchell." (Memo. Op. RE 681, PageID #: 9996) (citing *Wilkey and Brewer Dashcam Video*, at 21:32:19–21:32:22.).

As the trial court also noted, even assuming Mitchell was disobeying Wilkey's orders to not reach into his pants or reach for contraband on the hood of the car before striking and throwing Mitchell to the ground it was unclear from the video evidence. (Memo. Op. RE 681, PageID #: 9997-98). The trial court noted that Mitchell did not appear to grab anything. (Memo. Op. RE 681, PageID #: 9998).

The trial court determined that if these factual disputes are resolved in Mitchells' favor, the only act suggesting Mitchell exhibited any resistance was reaching his cuffed hands "down towards his pants" as the officers claim to have told Mitchell not to reach. (Id.) But the trial court noted that the response to this action, taking Mitchell to the ground and punching him half a dozen times – was excessive. (Id. at 9998-99)[8].

---

[8] The trial court cited *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017). The trial court also noted "If some force was warranted to retain control of Mitchell, a reasonable jury could find that repeatedly punching Mitchell while cuffed, held by another officer, and lying on the ground hardly qualifies as 'the least intrusive means reasonably available' to do so, as the Sixth Circuit requires." *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007) (citations omitted). " And the Sixth Circuit has clearly established an arrestee's 'right not to be struck . . . gratuitously.'" *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). (*Id.* at 9998, fn 30).

The trial court analyzed the remaining *Graham* factors (i.e.: the severity of the crime and the threat level Mitchell posed to the officers) and determined that genuine issues of material fact remained as to whether Wilky used excessive force. (Id. at 9998-99). The trial court noted:

> Mitchell did not appear to pose a threat to anyone in his immediate vicinity; he was already restrained by handcuffs—to which he fully submitted being secured around his wrists shortly upon exiting the vehicle—and two officers—one of whom was holding on to Mitchell's arm—at the time Wilkey tackled him to the ground. (*Wilkey and Brewer Dashcam Video*, at 21:29:59–21:30:01 (Wilkey placed handcuffs around Mitchell's wrists), 21:32:19–21:32:22 (Brewer holds on to Mitchell's forearm as Wilkey yanks Mitchell down to the ground).

(Id. at 9999).

This fact intensive analysis by the trial court resulted in a finding that a jury could conclude that Wilkey's use of force in kneeing Mitchell, taking him to the ground, and repeatedly punching Mitchel was excessive.

**b.    *Wilkey's qualified immunity and clearly established right claim.***

A right is clearly established when, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Despite this general rule, "[i]t is not necessary, . . . 'that the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also id.* at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.'" (citations omitted)).  That is, "there need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," as long as the defendants had "fair warning" that their conduct violated the plaintiff's rights.  *Goodwin v. City of Painsville*, 781 F.3d 314, 325 (6th Cir. 2015) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)).  Indeed, "[s]ome violations of constitutional rights are so obvious that a 'materially similar case' is not required for the right to be clearly established." *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). *See also See Campbell v. City of Springboro, Ohio*, 700 F3d 779, 788 (6th Cir. 2012 ("this is not to say that an official action is protect by qualified immunity unless the very action is question has been previously held unlawful … ."); and *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (officers "can still be on notice that their conduct violates established law even in novel factual circumstances").

Wilkey's claim that the law was not clearly established since no law was directly on point with *the facts* of this case (ROA – 20, at 34) strains credulity. The trial courts' factual analysis resulted in its ruling that in 2019 "it was clearly established" that using physical violence on "a detainee who

has been subdued" and is "not resisting arrest" constitutes excessive force, and thus Wilkey was not entitled to qualified immunity.[9]

**(IV)    CONSTITUTIONAL VIOLATION: WILKEY VIOLATED MITCHELL'S RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE SEARCH).**

Wilkey's claim that "exigent circumstances" justifies his strip search and his claim that "the law on *non-custodial* strip searches is "rather underdeveloped in this Circuit…"[10] ignores the facts that Wilkey and Brewer had Mitchell in custody, and the intensive factual analysis of the trial court.

***a.    Unreasonable roadside strip search.***

An otherwise permissible search can nonetheless be deemed unreasonable, and thus unconstitutional, considering the nature and circumstances of the search. *See Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application[,]" requiring proper consideration of "the scope of the particular intrusion, the manner in which [the search] was conducted, the justification for initiating [the search], and the

---

[9] *See, e.g., Kijowski v. City of Niles,* 372 F. App'x 595, 601 (6th Cir. 2010) (quoting *Wysong v. City of Heath,* 260 F. App'x 848, 856 (6th Cir. 2008)) ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right."); *Harris v. City of Circleville,* 583 F.3d 356 (6th Cir. 2009) (citing *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ("'The general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued' and 'is not resisting arrest.'").

[10] ROA-20, at 36.

place in which [the search] was conducted." *Id.* at 559 (citations omitted).

These factors comprise the *Wolfish* balancing test, which is often regarded as

a "touchstone" of Fourth Amendment analysis and is consistently invoked by

the Sixth Circuit. *See Mary Beth G. v. City of Chicago*, 723 F.2d. 1263, 1271

(7th Cir. 1983); *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480–81 (6th Cir. 2017)

("[T]he legal standard in [cases involving strip searches] requires us to

balance the nature of the intrusion against the need for the particular

search[.]"); *Stoudemire v. Mich. Dept. of Corr.*, 705 F.3d 560, 566 (6th Cir.

2013).

    The trial court found that the "most pertinent *Wolfish* factor in this case

is the scope of the intrusion." (Mem. Op. RE 681, PageID #: 10008). The trial

court went to lengths in citation of caselaw to support its factual findings:

> "Courts have consistently observed that the greater the intrusiveness of the police action, the greater must be the grounds justifying that action." *Timberlake by Timberlake v. Benton*, 786 F. Supp. 676, 691 (M.D. Tenn. 1992) (citations omitted). Strip searches are amongst the most egregious invasions of a person's individual rights. *See generally Wolfish*, 441 U.S. (describing strip searches involving visual inspection of one's genital area with language such as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission . . . .") (Marshall, J. dissenting); *Stoudemire*, 705 F.3d at 572–73 ("[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual.") (quoting *Wood v. Clemmons*, 89 F.3d 922, 928 (1st Cir. 1996)); *Timberlake by Timberlake*, 786 F. Supp. at 691 ("A strip search is undoubtedly one of the most intrusive ordeals an individual

may undergo."); *Florence v. Bd. Of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 341 (2012) ("Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many . . . .") (Alito, J., concurring); *Whitsett v. City of Etowah*, No. 1:07-cv-117, 2008 WL 4510326, at *8 (E.D. Tenn. Sept. 30, 2008) ("It is clear that searches as invasive as strip searches and/or body cavity searches may only be performed in certain narrow, limited circumstances."). And strip searches involving visual or physical inspection of a person's anal area may occupy the polar end of the invasiveness spectrum. *See Wolfish*, 441 U.S. at 576–77 (Marshall, J., dissenting) ("[T]he body-cavity search[] . . . represent[s] one of the most grievous offenses against personal dignity and common decency."), 594 (Stevens, J., dissenting) ("The body-cavity search—clearly the greatest personal indignity—may be the least justifiable measure of all."); *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (holding that a strip search involving visual inspection of the anal area was an "invasion of privacy rights . . . at its highest").

(Mem. Op. RE 681, PageID #: 10008-09).

The trial court then observed several facts to give rise to a genuine dispute of facts. Wilkey admitted that he performed a strip search of Mitchell, and that he put on gloves before searching Mitchell because he "didn't want to touch anything near Mitchell's scrotum or touch drugs with bare hands." (Mem. Op. RE 681, PageID #: 10009, fn 38). Wilkey denied any cavity search of Mitchell, but Mitchell's description of the dashcam video in his brief was "Wilkey *reaches* into Mitchell's anal region" as he conducts the search. (Mem. Op. RE 681, PageID #: 10009). The trial court made the same observation: "*With his gloved hand, Wilkey reached into Mitchell's anal area.*" (Memo. Op. RE 681, PageID #: 9987-88) (emphasis added).

The trial court held that Mitchell's account was "'not blatantly contradicted by the record, so no reasonable jury could believe it,' making it proper for the Court to accept Mitchell's versions of the events." (Mem. Op. RE 681, PageID #: 10009, fn 39).

The trial court reviewed the FBI report *appended to Wilkey's summary judgment motion*, which recounted Mitchell's FBI interview wherein Mitchell stated that Wilkey's finger hit his anus twice. The same Wilkey-appended FBI report discussed Mitchell's hospital treatment for anal fissure following his encounter with Wilkey and Brewer. (Mem. Op. RE 681, PageID #: 10009-10). Despite Wilkey's claims that Mitchell did not respond to the intrusion, the video of the incident showed that Mitchell appeared to *flinch* as Wilkey moved a gloved hand toward Mitchell's anal region. (Mem. Op. RE 681, PageID #: 10010).

The trial court next looked to another *Wolfish* factor (i.e.: place of the search) and held that this factor suggests that a jury could find the search unreasonable. (Id., at PageID #: 10010). The trial court cited numerous cases that addressed the inherent wrongness of strip searches in public. (Id., at PageID #: 10010-12). The trial court focused on the facts of *Timberlake*[11] and found that the facts differed from the case at bar. (Id., at PageID #: 10012-13).

---

[11] Cited and discussed in Section (I) of this Brief.

The trial court also noted that Wilkey believed he had the right to secure the "entirety" of Mitchell and seemed to argue that the concealment of an item on one's person justified the search that followed, however invasive that may have been and that Wilkey "subscribes to the maxim: 'Officer safety trumps policy.'" (Id., at PageID #: 10013, fn. 44). Yet, and as the trial court cited:

> The Supreme Court has noted that "the interests supporting a search incident to arrest"—the precise interests of officer protection and evidence preservation Wilkey cites —"would hardly justify disrobing an arrestee on the street[.]" *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983); *see also Wolfish*, 441 U.S. at 558 (stating that a strip search and visual inspection "instinctively gives [the Court] the most pause").

(Id., at PageID #: 10013).

Finally, Wilkey's arguments of "exigent circumstances" (ROA-20, at 43-47) ignores that the trial court did not find facts to support the need for such extreme conduct and ignores the law on strips searches.

### b.    *Wilkey's qualified immunity and clearly established right claim.*

Next Wilkey claims (again) that there is no caselaw *directly* on point with the facts in this matter and suggests since caselaw in this circuit reviewed strip and cavity searches "almost exclusively" in "detention facility contexts" (ROA-20, at 47-48) that somehow strip searches on the road are just fine. Wilkey further criticizes the trial court's reliance on district court matters and cases outside the 6th Circuit. (Id., at 48-49).

Wilkey also ignores the outlandish conduct Wilkey and Brewer displayed in their joint efforts. The trial court noted that Wilkey's employer, the Hamilton County Sheriff's Office, had policies that prohibited strip searches "of the kind at issue here" and "underscores the obviousness of its impermissibility." (Mem. Op. RE 681, PageID # 10015, fn. 46). The trial court also observed: "According to HCSO policy, a strip search 'shall be conducted in a controlled and private environment, such as a jail cell or detention area.'" (Id.) " The policy also prohibits body-cavity searches absent a search warrant or written waiver and requires that they be performed in a controlled environment by a licensed physician or nurse." (Id.).

**(V)   CONSTITUTIONAL VIOLATION: FAILURE TO INTERVENE.**

Wilkey makes the claim that Brewer did not use excessive force, and thus he is entitled to qualified immunity. However, Wilkey again ignores that the trial court made specific findings of fact.

*a.    The trial court found sufficient facts.*

The Sixth Circuit has consistently held that an officer can be liable for his failure to intervene and stop another officer's use of excessive force. *See, e.g., Batson v. Hoover*, 788 F. App'x 1017, 1021 (6th Cir. 2019); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In the excessive-force context,

> a police officer who fails to act to prevent the use of excessive
> force may be held liable when (1) the officer observed or had

40

reason to know that the excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Turner*, at 429 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

The trial court held that it found genuine disputes of material fact remained as to whether Mitchell resisted arrest and to what extent Brewer participated in the use of force on Mitchell. (Mem. Op. RE 681, PageID #: 10017). In its analysis, the trial court stated:

> Menifee testified that "it looked as if [Brewer] was punching [Mitchell]" when on the ground and disagreed with the statement "there's no evidence that Mr. Brewer punched Mr. Mitchell." She also said she remembered "see[ing] Officer Brewer hit [Mitchell] with his fist and feet." Similarly, Mitchell testified that Brewer "snuck some [punches] in" while on the ground and hit Mitchell in the back with his knee. The video does not clear up this dispute; while Brewer, Mitchell, and Wilkey are on the ground by Wilkey's patrol car, it is often unclear from Brewer's dashcam video which officer was punching Mitchell and where on his body Mitchell was being punched. Because a reasonable juror could find Brewer used force on Mitchell and that his use of force was excessive given the circumstances, the Court cannot now decide whether he breached his duty to intervene as those actions occurred.

(Id.) (internal citations omitted).

41

## (VI)    STATE TORT CLAIMS.

Wilkey's challenge to the trial court's factual findings appears to be the basis for his argument regarding the state tort claims. For the same reasons as his federal constitutional challenges should fail, so to must his challenge to the state tort claims. (*See* Mem. Op. RE 681, PageID #: 10019-20 [holding if state claims arise from § 1983 claims the responsible governmental employee may be liable; Mitchell's claims may proceed against Wilkey in his individual capacity]).

The trial court held that the same analysis applied to Brewer's claims for summary judgment. (Mem. Op. RE 681, PageID #: 10020, fn. 50).

### a.    *Wilkey is not entitled to summary judgment on the Assault and Battery claims.*

> "Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010). "In other words, [a] [p]laintiff's battery claim rises and falls with [a] [p]laintiff's excessive force claim at the summary judgment stage." *Hodge v. Blount Cnty.*, No. 3:16-cv-317, 2020 WL 2355631, at *5 (E.D. Tenn. May 11, 2020). The same is true of an assault claim under Tennessee law. *See Harris v. Metro. Gov't of Nashville*, No. 3:06–0868, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007) ("Because Tennessee courts apply the same 'excessive force' principles to assault and battery claims against police officers, the plaintiff has additionally set forth adequate grounds against each of the officers for assault and battery under Tennessee law.").

(Mem. Op. RE 681, PageID #: 10021).

The trial court cited Tennessee case law on the torts of Assault and Battery:

> To be held liable for assault, a defendant must have committed an "intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff." *Baker v. Moreland*, 1989 WL 89758, at *5 (Tenn. Ct. App. Aug. 9, 1989). A battery is defined under Tennessee law as "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another." *Raines v. Shoney's, Inc.,* 909 F. Supp. 1070, 1083 (E.D. Tenn. 1995).

(Mem. Op. RE 681, PageID #: 10020-21).

The trial court's review of the facts, mostly through review of the video, and the analysis under federal law revealed that Wilkey's force, which included repeated blows with a fist, coupled with the active participation of Brewer, all while a handcuffed and helpless Mitchell called out in pain and asked for help, was an assault and battery. As noted by the trial court's review of the video:

> At Wilkey's directive to "take [Mitchell's] clothes off," Brewer began to strip down Mitchell. (*Id.* at 21:35:12.) Wilkey proclaimed, "that's what [Mitchell] gets for reachin'." (*Id.* at 21:35:12.) Brewer pulled Mitchell's pants down and off of his body. (*Id.* at 21:35:30.) Mitchell, still pinned to the ground by Wilkey, yelled, "help!" (*Id.* at 21:35:37.) As Brewer shook out Mitchell's pants, Mitchell told Wilkey, "you're hurting me, man," and, more urgently, "my shoulders!" (*Id.* at 21:35:45.) Wilkey responded, "I ain't hurtin' you man, I'm holding you down." (*Id.* at 21:35:47.)

(Memo. Op. RE 681, PageID #: 9985).

Based upon the facts reviewed by the trial court, Wilkey's claims for summary judgment must fail.

**b.     *Wilkey is not entitled to summary judgment on the Negligence claims.***

The Sixth Circuit has held that a police officer has a duty to intervene to prevent other officers from violating an individual's constitutional rights, to include the use of excessive force. *See Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001). In the case at bar, the trial court found that Wilkey had a duty to intervene in Brewer's use of force against Mitchell. (Mem. Op. RE 681, PageID #: 10021-22). The video recordings show Brewer and Wilkey's conduct, and hence why neither Appellant is entitled to summary judgment on the negligence claims. Wilkey not only failed in his duty to intervene in Brewer's conduct, but he also directed some of Brewer's actions as noted by the trial court:

> At Wilkey's directive to "take [Mitchell's] clothes off," Brewer began to strip down Mitchell.  (*Id.* at 21:35:12.)

(Memo. Op. RE 681, PageID #: 9985).

This Court has been provided with a copy of the Wilkey/Brewer videos. Wilkey failed to stop Brewer's actions, and this Court can determine if the video supports Mitchell's accounts, which is something a jury can also decide.

**(VII)   <u>Constitutional Violations</u>: Brewer Violated Mitchell's Rights Under the Fourth Amendment (Unreasonable Seizure by Excessive Force).[12]**

Brewer acknowledged in his own words: "In the case at bar, the force used by Brewer on the night of July 10, 2019 is disputed." (Brewer Mem. in Support of Mot. Summary Jud. RE 612, PageID #: 6846; Mem. Op. RE 681, PageID #: 10023). The trial court further cited to Brewer's concession that Mitchell and Menifee both claimed they observed Brewer use physical force on Mitchell and noted Brewer's claims that the video "clearly" showed he never "once struck Mitchell" was contradicted by the video evidence. (Mem. Op. RE 681, PageID #: 10023-24). Brewer repeated this *same argument* in his Brief to this Court. (ROA 19, at 46-47).

However, the trial court noted that the video evidence is replete with instances (such as those noted *supra* in the Statement of the Case), such as one that showed Brewer, Wilkey, and Mitchell all on the ground[13] and the trial

---

[12] In analyzing the facts and the law regarding Brewer's claims, the trial court referenced and incorporated its analysis of the law and facts when addressing Wilkey's reasons why was entitled to summary judgment. (RE 681, PageID #: 10023, 10025-27). For brevity, Mitchell responds in similar fashion in this Brief, and will incorporate by reference the same legal authority used in Mitchell's responses to Wilkey's various claims on appeal.

[13] Although the trial court stated "Brewer, Wilkey, and Menifee" were all on the ground, the trial court (in the same sentence) references Mitchell. (Mem. Op. RE 681, PageID #: 10024). The videos presented to the trial court and this Court also show it was Brewer, Wilkey, and Mitchell on the ground.

court noted that it was "unclear which officer is punching Mitchell." (Mem. Op. RE 681, PageID #: 10023-24). Brewer on one hand acknowledged "certain portion of the video may be difficult to see or decipher …" then argues on the other hand that "it is clear" that Brewer did not punch, kick, knee, elbow, or otherwise strike Mitchell. (ROA 19, at 48).

Brewer goes on in his principal brief to minimize the disputed evidence by first citing to non-video record entries (i.e.: Mitchell claiming at deposition that Brewer "snuck some [hits] in"), comparing these entries to Brewer's deposition, then claiming that the video evidence "blatantly contradicted" Mitchell's claims. (ROA 19, at 48-49). Indeed, the trial court noted Menifee testified that she saw Brewer punch Mitchell on the ground, and Mitchell testified that Brewer "snuck" in some punches and hit him in the back with his knee. (Mem. Op. RE 681, PageID # 10017). The trial court went on to say about Wilkey's failure to intervene in Brewer's actions that the video did not clear up this dispute. (Id.). Consequently, Brewer's argument merely quibbles with the trial court's factual findings.

## a.    *Brewer's use of force violated clearly established law.*

The law is "clearly established" for purposes of denying immunity if the "contours of the right" at issue were "sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, if a reasonable officer would have known not to do what Brewer and Wilkey did, then Brewer is not entitled to immunity. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013) (citing *Anderson* at 640)).

Stated another way, the courts "have to zoom in close enough to ensure the right is appropriately defined"— "[b]ut not too close." *Martin* at 960.

> [J]ust as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of §1983 to define the right too narrowly (***as the right to be free of needless assaults by left-handed police officers during Tuesday siestas***).

*Martin* at 960 (alteration made by *Martin*) (quoting *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d at 508-509) (emphasis added).

This Court's "task, then, is not to match each application of force with a precisely analogous case to demonstrate its prohibition." *Martin* at 960-961. "Although the court is to consider whether the violative nature of *particular* conduct is clearly established, it should also avoid a rigid, overreliance on factual similarity that could overwhelm the clearly established prong." *Sexton v. Cernuto*, 18 F.4th 177, 191 (6th Cir. 2021) (internal citations omitted). Instead, "the salient question" is whether the officers had "fair

warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. at 741.

Brewer's entire basis for this claim is simply his disagreement with the trial court's findings of fact. (ROA 19, at 50-51). Brewer's argument is much like the "the right to be free of needless assaults by left-handed police officers during Tuesday siestas" observation by the *Martin* Court. However, in this instance the law is clear that police cannot use excessive force, and Brewer cannot prevail in this claim.

## (VIII)   CONSTITUTIONAL VIOLATION: BREWER VIOLATED MITCHELL'S RIGHTS UNDER THE FOURTH AMENDMENT (UNREASONABLE SEARCH).

Brewer again quibbles with the trial court's factual findings. The trial court specifically reviewed the video, which the trial court found, "confirms that Brewer's role amounted to, at a minimum, to a strip search of Mitchell – removing Mitchells' pants, pulling down his underwear, and shining a light on his exposed buttocks." (Mem. Op. RE 681, PageID #: 10025).

Brewer makes numerous claims that are disputed, such as his claim that "there is no evidence that Menifee *saw the private parts of Mitchell's body.*" (ROA 19, at 37). Yet, the trial court found that Menifee was close enough to see and then state, "what the fuck?", when Wilkey pulled down Mitchell's underwear fully exposing his buttocks. (Mem. Op. RE 681, PageId #: 9987). The trial court also noted Mitchell's back faced away from the camera, but

that Menifee said, "a cavity search was conducted on Mitchell, and his anus was penetrated twice during the arrest." (Mem. Op. RE 681, PageID #: 9987, fn. 21).

Brewer also claims many "what ifs" to justify that since no one could have possibly seen anything at night, that there was no unreasonable search. (ROA 19, 36-37, "On a dark night onlookers would have seen the overall picture of what occurred, not the private areas of Mitchell's body"). But much like where the US Supreme Court held that "after-the-fact" speculation as to what an officer should have done is prohibited[14], this manner of speculation is also prohibited for this interlocutory appeal.[15] Additionally, the trial court cited to cases that held a strip search does not have to have someone to actually see the event for it to be unlawful. (Mem. Op. RE 681, PageID #: 10010-11).[16]

---

[14] *Graham*, 490 U.S. at 396.

[15] *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998). ("[I]f what is at issue in the appeal is nothing more than 'whether the evidence could support a finding that particular conduct occurred,' there is no appellate jurisdiction.").

[16] *Iskander v.Vill. of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982) (refusing to entertain that strip searches conducted in open view comport with the Fourth Amendment's reasonableness requirement); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("[N]o police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental invasion of the personal rights that such a search entails.") (citation and internal quotation omitted); *Foster v. City of Oakland*, 621 F. Supp. 2d 779, 792–93 (N.D. Cal. 2008) (suggesting that field strip search policies that do not require the search

Brewer also seems to make an "ends justify the means" argument that since Wilkey found a needle that the search and force used allowed qualified immunity. (ROA 19, at 38). However, that incident also involved a question of fact. The following is from Brewer dashcam that is part of the trial court record:[17]

> 21:37:36 Wilkey looks to the ground at a spot some distance (maybe in feet) from where they forced Mitchell to the ground earlier. Wilkey does NOT pick up anything off the ground at this point.
>
> 21:37:36 to 21:37:39 Wilkey's right hand opens as he looks back toward Brewer and Mitchell.
>
> 21:39:10-23 flashlight of Appellants on the pavement do not show a syringe.
>
> 21:39:37 Brewer and Wilkey close the door as they pushed Mitchell into the police car.

---

be performed in a private area fail to safeguard an arrestee's Fourth Amendment right to physical privacy); *Rattray v. Woodbury Cnty.*, 908 F. Supp.2d 976, 1014 (N.D. Iowa 2012) (collecting cases in which courts found a strip search unconstitutional and observing that "each decision involved the *actual presence* of non-participants who *could have seen* the strip searches[]") (emphasis in original). (Mem. Op. RE 681, PageID #: 10011).

[17] Depending on which appendix from the trial court that this Court considers, Brewer's dashcam is Exhibit 1 as noted on RE 611-1, PageID #: 6693 [from Wilkey's Amended Motion for Summary Judgment], and Exhibit 1 as noted in RE 610-1, PageID #: 6572 [from Brewer's Amended Motion for Summary Judgment]. *Mitchell believes, after extensive review of each lengthy video, that they are nearly identical.* Thus, all time stamps cited herein shall be to **Brewer's Dashcam, Exhibit 2** of RE 610-1. Mitchell also believes that the same dashcams have been provided to this Court by the Defendants. (ROA 21).

21:39:36 After Appellants shut the car door, Wilkey immediately says "there's a needle… ."

21:39:37-39 Wilkey *immediately* turns behind him and picks up something from the ground. This exact point is near the right rear tire of the police car away from where the Appellants had Mitchell on the ground and on the hood of the police car.

This scenario, as observed by Mitchell in this brief, also equally suggests that Wilkey dropped the syringe to justify the Appellants' force and manner of search. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). *See also Miller v. Sanilac Cty.*, 606 F.3d 240, 248-49 (6th Cir. 2010) (concluding where officer said driver was intoxicated by BAC was 0.0%, jury could conclude officer was lying). In any event, for a jury to decide.redibility

a.    ***Brewer's search violated clearly established law.***

Brewer against asks this Court to draw a "right to be free of needless assaults by left-handed police officers during Tuesday siestas" conclusion as rejected by the *Martin* Court. Brewer criticizes the trial court for "splicing together outside circuit and district court cases to satisfy the clearly established standard." (ROA 19, at 40). Yet Brewer fails to recognize that the law from this circuit in *Sexton v. Cernuto*, and the US Supreme Court in *Hope*

*v. Pelzer* does not require such a strict requirement. The trial court noted that Hamilton County Sheriff's Office policy required a strip search to be "conducted in a controlled and private environment, such as a jail cell or detention area." (Mem. Op. RE 681, PageID #: 10015, fn. 46). The trial court also noted that the Appellants "removing Mitchell's pants, pulling down his underwear, and illuminating his exposed buttocks, all while on the side of a highway and directly in *front of Menifee*—violated clearly established law." (Mem. Op. RE 681, PageID #: 10025) (emphasis added).

**(IX)    CONSTITUTIONAL VIOLATION: BREWER'S FAILURE TO INTERVENE.**

Brewer decries the trial court's denial of summary judgment because [1] there was no excessive force used by Wilkey, and [2] even if so, Brewer did not have time to intervene. (ROA 19, at 52).

The trial court found ample facts that Wilkey used excessive force, and Mitchell has recited verbatim in his Statement of the Case the facts as determined by the trial court. The trial court also cited the law of this Circuit that an officer, in an excessive force context, can be liable for his *failure* to intervene and stop another officer's use of excessive force. *See, e.g. Batson v. Hoover*, 788 F. App'x 1017, 1021 (6th Cir. 2019); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). (Mem. Op. RE 681, PageID #: 10016-17).

Brewer's second argument strains credulity. He effectively is saying that he did not see what Wilkey was doing all while actively participating in the event and even following Wilkey's command. Either Brewer had tunnel vision, or he was so caught up in the moment of abusing Mitchell that he ignored Wilkey. Either way, he is not entitled to summary judgment on the facts.

### a.    *Brewer's claims that his failure to intervene did not violate clearly established law.*

Brewer again ignores the case law that Mitchell and the trial court have cited regarding the particularity of the notice. Additionally, and more importantly, Brewer's claim that "the video is clear" (ROA 19, at 58) is yet another example of why his disagreement with the trial court is a disagreement over the facts. Again, and as the trial court noted while citing 6th Circuit case law[18]: "And a reasonable juror could conclude that Wilkey's response to this

---

[18] *See Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017). (citing *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)) ("A reasonable juror could conclude that, in pulling his arm away, [plaintiff's] resistance was minimal and that [defendant's] response in taking [plaintiff] to the ground was excessive."); *see also Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (citations omitted) ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *5 (6th Cir. Mar. 15, 2023) (holding that plaintiff's attempt to "pull his hand away" when an officer reached for his arms and to "move[] his body in a way to protect his head and torso" during

action—tackling Mitchell to the ground and punching him at least half a dozen times—was excessive." (Mem. Op. RE 681, PageID #: 9998-99). The trial court also noted the following facts from the videos that prevents Brewer from prevailing in his argument:

> Mitchell did not appear to pose a threat to anyone in his immediate vicinity; he was already restrained by handcuffs—to which he fully submitted being secured around his wrists shortly upon exiting the vehicle—and two officers—one of whom was holding on to Mitchell's arm—at the time Wilkey tackled him to the ground. (*Wilkey and Brewer Dashcam Video*, at 21:29:59–21:30:01 (Wilkey placed handcuffs around Mitchell's wrists), 21:32:19–21:32:22 (Brewer holds on to Mitchell's forearm as Wilkey yanks Mitchell down to the ground).) Mitchell communicated to Wilkey and Brewer early in the encounter that he was in a great deal of pain due to his hernia and, while on the ground and restrained by handcuffs and Brewer, seemed to be in no position to overpower Wilkey and Brewer. (*Id.* at 21:30:34.) Nor was Mitchell suspected of committing any violent crime.

(Mem. Op. RE 681, PageID #: 9999).

## (X)   STATE TORT CLAIMS.

### a.   *Brewer is not entitled to summary judgment on Assault and Battery.*

"Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin v. Hardrick*, 604 F.3d

---

the officers' use of force "could be considered minimal, passive resistance that cannot justify the [o]fficers' use of force")

949, 956 (6th Cir. 2010). "In other words, Plaintiff's battery claim rises and falls with Plaintiff's excessive force claim at the summary judgment stage." *Hodge v. Blount Cty.*, No. 3:16-CV-317, 2020 U.S. Dist. LEXIS 82495, at *13-14 (E.D. Tenn. May 11, 2020). The trial court noted that Brewer claimed since he used only "body weight distribution" force on Mitchell by holding him down that the force was necessary to arrest Mitchell. (Mem. Op. RE 681, PageID #: 10027). In his Brief, Brewer relies on the video and claims "undisputed facts" that Brewer did not use excessive force. (ROA 19, at 60). Yet the trial court denied Brewer's excessive force claim after an in-depth review of the video evidence, and thus denied the assault and battery claims.

### b.    *Brewer is not entitled to summary judgment on Negligence.*

The trial court cited its review of its analysis of Wilkey and Brewer's arguments to deny Brewer's motion for summary judgment. (Mem. Op. RE 681, PageID #: 10026-27). Brewer claims that "Mitchell has produced no evidence to show that Brewer beached any duty owed or that such a breach was the cause in fact or proximate cause of his claimed injuries." (ROA 19, at 61). Yet, the trial court determined since the video was "unclear" as to exactly the force was used, when, and by whom that it could not resolve the factual question. (Mem. Op. RE 681, PageID #: 10026). Again, Brewer's arguments

are a challenge to the trial court's findings and not proper for interlocutory appeal.

## CONCLUSION

Wilkey and Brewer's appeal is nothing more than a disagreement over the trial court's findings of fact and an argument on credibility. Thus, this Court does not have jurisdiction over this appeal. Notwithstanding Mitchell's assertions as to jurisdiction, the trial court reviewed video evidence when it analyzed the Appellants' claims for immunity. Certain examples are: Wilkey pounding on a handcuffed Mitchell, with Brewer joining in; Brewer removing Mitchell's pants and shaking them out. The video also shows Mitchell cooperating as soon as he exits his vehicle, and a jury could determine that the Appellants' own actions unnecessarily escalated the incident. The video suggests Wilkey dropping something on the ground, then picking up a syringe while saying, "there's a needle."

Additionally, the law was clear that the Appellants could not engage in the conduct described in the record. Appellants want this Court to have a rigid standard similar to the "right to be free of needless assaults by left-handed police officers during Tuesday siestas" standard as discussed by the *Martin* Court. Such a standard to determine a clearly established right is not the law.

Mitchell moves this Court to dismiss the appeal, or to affirm the trial court's ruling, and to tax costs upon Appellants.

Respectfully submitted,

/s/ Robin Ruben Flores
     Robin Ruben Flores (TN BPR 20751)
     4110-A Brainerd Road
     Chattanooga, Tennessee 37411
     Telephone: (423) 267-1575
     Facsimile: (423) 267-2703
Email: robin@robinfloreslaw.com


/s/ Andrew C. Clarke
     Andrew C. Clarke (TN BPR 15409)
     One Commerce Square, Suite 1700
     Memphis, Tennessee 38103
     Telephone: (901) 5231222
     Facsimile: (901) 523-1999
Email: aclarke@cochranfirmmdisouth.com

*Attorneys for James Myron Mitchell*

## **CERTIFICATE OF SERVICE**

In compliance with FRAP Rule 25 and L.R. 25 I hereby certify that on this 10th day of November, 2023, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Sixth Circuit this Brief of the Appellee, and further certify that opposing counsel will be notified of this filing through the Notice of Docket Activity generated by this electronic filing.

/s/ Robin Ruben Flores
Robin Ruben Flores (TN BPR 20751)
4110-A Brainerd Road
Chattanooga, Tennessee 37411
Telephone: (423) 267-1575
Facsimile: (423) 267-2703
Email: robin@robinfloreslaw.com

/s/ Andrew C. Clarke
Andrew C. Clarke (TN BPR 15409)
One Commerce Square, Suite 1700
Memphis, Tennessee 38103
Telephone: (901) 5231222
Facsimile: (901) 523-1999
Email: aclarke@cochranfirmmdisouth.com

*Attorneys for James Myron Mitchell*

Counsel Served
James Exum, III
CHAMBLISS, BAHNER & STOPHEL
605 Chestnut Street
Suite 1700
Chattanooga, TN 37450
423-756-3000

William Gerald Tidwell, Jr.
Matthew D. Tidwell
TIDWELL AND ASSOCIATES
1810 McCallie Avenue
Chattanooga, TN 37404
423-602-7511

## CERTIFICATE OF COMPLIANCE

The foregoing brief contains 14,704 words of Times New Roman (14 point) proportional type. The word processing software used to prepare this brief was Microsoft Word. The word count exceeds the type-volume limitation provided in Fed. R. App. P. 32(a)(7). On October 20, 2023 Appellee's motion to file oversized brief was granted in part by setting the word count limit at 23,000 words.

/s/ Robin Ruben Flores
      Robin Ruben Flores (TN BPR 20751)
      4110-A Brainerd Road
      Chattanooga, Tennessee 37411
      Telephone: (423) 267-1575
      Facsimile: (423) 267-2703
      Email: robin@robinfloreslaw.com

/s/ Andrew C. Clarke
      Andrew C. Clarke (TN BPR 15409)
      One Commerce Square, Suite 1700
      Memphis, Tennessee 38103
      Telephone: (901) 5231222
      Facsimile: (901) 523-1999
      Email: aclarke@cochranfirmmdisouth.com

*Attorneys for James Myron Mitchell*

## <u>DESIGNATED CONTENTS</u>

Pursuant to Sixth Circuit Rule 11(b), the Appellee hereby designates

the following filings in the district court's record:

| <u>Description of Item</u> | <u>Record Entry</u> | <u>PAGE ID #s</u> |
|---|---|---|
| Notice of Removal | RE 1 | 1-3 |
| Complaint | RE 1-1 | 4-37 |
| Motion for Summary Judgment | RE 610 | 6566-68 |
| Appendix of Exhibits | RE 610-1 | 6572 |
| Deposition | RE 610-2 | 6609-6620 |
| Motion for Summary Judgment | RE 611 | 6688-89 |
| Appendix of Exhibits | RE 611-1 | 6693 |
| Deposition | RE 611-2 | 6701-6706 |
| Memorandum | RE 612 | 6846 |
| Response | RE 645 | 7570, 7593 |
| Memorandum Opinion | RE 681 | 9977-10028 |